FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   JUN 18 2012   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

AMIRON DEVELOPMENT CORP., HERZEL MEIRI
and ITZHAK KHATAN ,

**COMPLAINT
WITH JURY DEMAND**

                                           Plaintiffs,

Case No.:

-against-

# CV-12 3036
# SEYBERT, J
# BOYLE, M
## SUMMONS ISSUED

STEWART SYTNER, HILARY SYTNER a/k/a
HILARY BERLIN, THOMAS P. MEGAS,
CEFEIDA, SA, SCOTT WAGMAN, MILTON
MILLER, and DAVID WISEMAN,

                                           Defendants.

------------------------------------------------------------------------X

Plaintiffs Amiron Development Corp., Herzel Meiri and Itzhah Khatan, as and for their

Complaint against defendants Stewart Sytner, Hilary Sytner a/k/a Hilary Berlin, Thomas P.

Megas, Cefeida, SA, Scott Wagman, Milton Miller and David Wiseman, allege as follows:

## NATURE OF ACTION

1.  This action arises from an ongoing scheme and conspiracy crafted, created and

carried out by the defendants with the specific and sole purpose of fraudulently converting and

embezzling over one million dollars from plaintiffs through a structured patterns of lies, deceit,

manipulations and misrepresentations. As conspirators, defendants were aware of each other's

actions and intentions in connection with their deceptions to steal plaintiffs' money.  Defendants'

scheme was carried out through the U.S. mails and wires and involved a pattern of predicate acts

in this District and elsewhere.

2.   Plaintiffs seek to recover monetary damages incurred as a result of defendants' unlawful and deceptive acts of mail fraud, wire fraud, securities fraud, common law fraud, conversion, breaches of trust, breaches of fiduciary duty, the abiding and abetting of said breaches, and other wrongful conduct.

## THE PARTIES

3.   Plaintiff Itzhak Khatan ("Khatan") is a resident of Great Neck, Nassau County, New York.

4.   Plaintiff Herzel Meiri ("Meiri") is a a resident of Great Neck, Nassau County, New York, and is the principal of plaintiff Amiron Development Corp. ("Amiron").

5.   Upon information and belief, defendant  Stewart Sytner ("Sytner"), is an individual residing in Great Neck, Nassau County, New York.

6.   Upon information and belief, defendant Thomas P. Megas ("Megas"), is a British National residing in Switzerland and transacting business in this District.

7.   Upon information and belief, defendant Cefeida, S.A. ("Cefeida"), is a foreign corporation formed under the laws of Panama and transacting business in this District.

8.   Upon information and belief, defendant Scott Wagman ("Wagman"), is a resident of Woodmere, Nassau County, New York.

9.   Upon information and belief, defendant Milton Miller ("Miller"), is a resident of the State of New Jersey and transacting business in this District.

10.  Upon information and belief, defendant Hilary Sytner a/k/a Hilary Berlin ("Berlin"), is a resident of Great Neck, Nassau County, New York.

11.   Upon information and belief, defendant David Wiseman ("Wiseman"), is a resident of Cedarhurst, Nassau County, New York.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 18 U.S.C. § 1964(c) as claims are asserted under the laws of the united States of America under the *Racketeer Influenced and Corrupt Organizations Act* ("RICO"), 18 U.S.C. § 1961 *et seq.* and  18 U.S.C. § 1962 *et seq.* This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §1367.

13. This Court has personal jurisdiction over the defendants in that they: (i) reside or are authorized to do or are doing business in the State of New York; (ii) transact business in the State of New York; and (iii) have committed torts, other misconduct, and statutory violations within the State of New York and in this District.

14. Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the events and transactions alleged herein occurred in this District.

## FACTUAL BACKGROUND

15.  Plaintiff Khatan is a highly respected and successful business man engaged in the business of real estate development among other business and investment activities.

16.  Plaintiff Meiri is similarly a successful and well respected business man and entrepreneur.

17. In or about 2009, Khatan was introduced to Syntner by the son of a close friend and colleague, Steven Mizrachi. In turn, Sytner was introduced to Mizrachi by defendant Miller, who was widely know in the community as a wealthy, well respected and honorable business man for

over forty years.  Defendant Miller portrayed these same qualities of Synter and, in fact, Sytner appeared to have a good reputation as businessmen in the Great Neck community.

18. Khatan met the remaining defendants, through defendants' fraudulent scheme as same unfolded.

19. Over the course of about a two year period, the defendants, acting in concert, and with the assistance of their cohorts and co-conspirators, devised and carried out several predatory schemes to convert and steal substantial sums of money from plaintiffs.

20. These schemes were carried out by and as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), consisting of an on-going association-in-fact of these named defendants.

19.     Defendants, as members of an enterprise, were a continuing unit who engaged in a particular course of fraudulent conduct by working together, in concert, to achieve their common goal of defrauding plaintiffs of approximately $1.3 million usd.

20.     Defendants' misconduct was concerted and their object was to participate in the conduct and affairs of the enterprise through a pattern of racketeering activities that included violations of the federal mail and wire fraud statutes.

21.     Defendants' unlawful activities affected interstate commerce and plaintiffs have been injured by such conduct as described below.

22.     Each of the actions taken by the defendants was taken in furtherance of the fraudulent schemes alleged herein.

23.     Defendants engaged in repeated acts of mail and wire fraud in connection with the willful misrepresentations contained in the telephone calls, emails, and mailings, as particularized below, in violation of 18 U.S.C.§§1341 and 1343.

24.     Based upon plaintiffs' investigation to date, plaintiffs are not the only victims of the defendants' schemes and fraudulent conduct. Rather, upon information and belief, defendants are notorious charlatans and swindlers who engaged in many other schemes with many other victims over many years.

25.     Defendant Miller represented to plaintiff Khatan that Syntner was a well respected, wealthy, and trustworthy business man. In fact, Syntner portrayed and held himself out as not only a highly successful businessman, but also a purported diplomat, supposedly holding the position of Consular General of Papua New Guinea in New York, even going so far as referencing is purported diplomatic status in his email, to wit: diplomatzvi@aol.com. Sytner also distributed "official" business cards indicating his supposed diplomatic status. In reality, however, defendant Sytner never held such post according to the United States Foreign Service and Papua New Guinea Consular Services websites.

26.     Synter is also apparently a defendant in several bankruptcy adversary proceedings in the Southern District of Florida, wherein the return of monies paid to or 'invested with" Sytner are sought by the Trustees appointed in those cases.

27.     In addition to the foregoing, and in furtherance of his charade, Synter holds himself out as the "official administrative contact" for the "Government of Me'ekamui" of Bougainville Island, part of the North Solomon Island Archipelago, which self-proclaimed "government" is supposedly run by "King David Pei III".

28.     King David Pei III was born Moses Noah Musingku and is a native of the village of Tonu, Siwai District, in the southwest of Bougainville Island. Musingku is widely disparaged in the international press as nothing but a "con-man".

29.     Musingku is generally credit with creating the "U-Vistract" investment system which is widely held to be nothing more than a Ponzi scheme. In fact, Musingku was arrested and denigrated by the Australian Securities and Investment Commission (ASIC) for selling and offering unlicensed securities and other investment schemes.

30.     Musingku and his Me'ekamui government also purport to control the Bouganville Cooper and Gold mine which is the central piece of the defendants' scheme herein.

**The Bougainville Gold Mine Scheme**

31.     On or about April 7, 2009, Defendant Sytner, via a mutual acquaintance, approached plaintiff Khatan with a supposed investment opportunity.

32.     Synter, counting on his reputation as an astute businessman preceding him, approached Khatan and suggested that they meet to discuss lucrative potential "exclusive" investment opportunities that Syntner could procure for Khatan utilizing his diplomatic status and government contacts in Papua New Guinea.

33.     Given that Syntner was represented to be a wealthy and honorable business man by defendant Miller, Khatan agreed to meet with Sytner and his co-horts to discuss these "investment opportunities".

34.      In preparation for said meeting on or about April 5, 2009, Khatan received correspondence from defendant Megas outlining their "investment" proposal.

35.     Said proposal laid out defendants' supposed investment proposal to mine, refine and export gold from the Panguna Region, Bougainville, Papua New Guniea.

36.     Defendants represented to plaintiff Khatan that defendants possessed the exclusive rights to develop, mine and otherwise commercially exploit the said mine and region and four other regions located around the Bougainville mine. See **Exhibit "A"**.

37.     It was further represented to Plaintiff Khatan that said rights exclusively held by the defendants were extremely valuable and rare for outsiders. As expressed to plaintiff, it was purportedly the intention of defendants to set up a gold mining operation in the above referenced region to mine, refine, sell and otherwise exploit the mine's resources.

38.     In exchange, the "investors", were initially required to provide the defendants with the sum of $2.5million U.S. dollars, according to defendants, in order to partake in this "exclusive investment".  Further, according to defendants, the assets supposedly held by the defendants were valued at an amount which would more than adequately secure the Plaintiffs' "investment".

39.     Notwithstanding the foregoing however, defendants' "Operating Plan", which was  provided to plaintiff Khatan to further entice their investment into the scheme, called for a relatively smaller investment of $1,363,500,00 to get the gold mining operation going and showed a supposed annual yield after only the first year of $77,787,781.44. See **Exhibit "B"**.

40.     All Defendants, acting in concert and in furtherance of their scheme to defraud plaintiffs, continued to solicit the investment of plaintiff's via specious representations with respect to gold mining operations and rights of defendants. In fact, Synter represented that all "due diligence" with respect to the mining operation had already been performed by two independent geologists familiar with the region and that all necessary reports and samples were found satisfactory and that Synter himself had covered the expense of same so that there was no need for plaintiffs to spend additional money to conduct their own investigation in to the operations of the mine. See **Exhibit "C"**.

41.     Based wholly upon defendants' false and misleading representations, plaintiffs agreed to invest the initial sum of $1,250,000.00 in defendants gold mining "venture". Defendants agreed to issue plaintiffs share certificates in Cefeida, SA as evidence of plaintiffs' supposed "investment". No such shares were ever issued despite assurances from the purported Spanish Attorney for Cefeida, SA. See **Exhibit "D"**.

42.     Subsequently an agreement memorializing the agreement of the parties was entered into on or about June 23, 2009, and thereafter amended on July 13, 2009.  See **Exhibit "E"**.

43.     Pursuant to the terms of the above mentioned agreement, plaintiffs, via their attorney wired the sum of $1,249,914.20 to the account of defendants' attorney for further credit to defendants themselves. See **Exhibit "F"**.

44.     After plaintiffs' initial investment, defendants continued upon a campaign of lies and deceit to conceal the true nature of their scheme. Over a year later however, sensing that something was not right as this point because nothing defendants ever promised seemed to materialize, it started to become evident too plaintiffs that they had been defrauded out of their money by the concerted scheme of the defendants. Not only did defendants seem to eventually disappear except for sporadic and nonsensical email communication, they provided no real evidence as to the status of plaintiffs' investment despite frequent, repeated demands by plaintiff Khatan to do so. In fact, plaintiff Khatan was so unnerved by the lack of communication and simple unresponsiveness on the part of defendants that he had his attorney write to the defendants to demand answers. See **Exhibit "G"**.

45.     The response of Defendant Synter, was equally unnerving as it was not only contradictory to Synter's prior statements to plaintiff Khatan but also merely served as a continued smoke screen to draw attention away from the malfeasance and nonfeasance of defendants. In fact, Synter insisted that he was not an officer, owner or shareholder of Defendant Cefeida, SA, despite having held himself out as such from the beginning of the subject "investment".

46.     Based on defendants' peculiar and evasive behavior, plaintiffs, on or about June 7, 2010, decided to send a representative to visit the supposed mining site. Upon arrival, not only was it evident that defendants did nothing of what they agreed to due and simply spent and squandered plaintiffs "investment" money for their own personal purposes, but also managed to extort and additional $50,000.00 from plaintiffs by stranding their representative in the jungles of Papua New Guinea for days without contact with the outside world.

47.     Plaintiffs Khatan and Meiri also traveled to Papua New Guinea themselves to investigate the claims of the defendants and was only led around in circles and never brought to witness the mining operation which was, according to defendants, already operational and ready to export gold. Telling is the fact that defendants supposedly spent Plaintiffs' money to acquire the necessary equipment to run the mine, but any such equipment was, in reality, non-existent. In fact, in or about early December, 2009, defendants knowingly and wrongfully represented to plaintiffs that gold had already been mined, refined and was ready to be shipped for export. However, when no such shipments arrived and plaintiffs pressed defendants for answers, defendants merely engaged in a systematic pattern of lies and deceit in furtherance of their enterprise to defraud plaintiffs out of their money. Defendants repeatedly insisted that the purported shipment of gold that plaintiffs were awaiting was either delayed by inclement weather

in the region, issues with customs and/or freight forwarders. Needless to say, none of these excuses were in fact true and were only meant to cover up the nefarious conduct of defendants.

48.     Upon the return of plaintiffs' representative from New Guinea, and based on what plaintiffs Khatan and Meiri witnessed on their trip the Solomon Island, the site of the purported refinery, it was made absolutely clear to plaintiffs that they had been purposefully defrauded out of their money by defendants as the Bougainville Mining Operation "investment" was a non-existent scam and that plaintiffs were not the only victims of the "enterprise" as apparently defendants regularly conduct their "business" in the concerted, scheming manner set forth herein. See **Exhibit "H"**.

49.     To date, defendants continue to be unresponsive to plaintiffs and offer no explanations other than vague and specious and empty references to supposedly attempting to repay the amounts invested by plaintiffs in defendants' fraudulent scheme. See **Exhibit "I"**.

## FIRST CAUSE OF ACTION

### (Violation of 18 U.S.C. §§1962(a), 1962 (b), 1962 (c), *et seq.* as Against all Defendants)

50.     Plaintiffs repeat and re-allege each and every allegation set forth herein above.

51.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) because they are individuals or entities capable of holding legal and beneficial interests in property.

52.     Defendants, at all times material to this action, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).

53.     Defendants conducted, directed, and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, which affected interstate commerce at all times material to this action.

54.    Defendants were the principal architects of, and conducted the enterprise's affairs through the pattern of racketeering activity set forth above.

55.    Although defendants participated in the enterprise and were part of it, they also have an existence separate and distinct from the enterprise.

56.    The enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which defendants engaged.

57.    The association-in-fact enterprise described above has engaged in and has affected interstate commerce by repeatedly using or causing the use of the mails and interstate wires in furtherance of the fraudulent enterprises in violation of 18 U.S.C. §1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). These mailings and wirings include, but are not limited to, the mailings and wirings described and particularized above.

58.    Each of the above referenced violations by defendants o the mail and wire fraud statutes, constituted an instance of racketeering activity as defined in 18 U.S.C. §1961(1).

59.    The multiple acts of racketeering activity, which were committed in the course of related fraudulent schemes over a substantial period of time, the last of which occurred within ten (10) years after the commission of a prior act of racketeering activity, constitute a "pattern of racketeering activity", as defined in 18 U.S.C. § 1961(5), which include, but are not limited to the following predicate acts of fraud carried out, inter alia, though the U.S. mails and wires:

(a)    falsely representing to Khatan that that the $1.25 million that plaintiffs wired to defendants in  2009 was used to finance the operation of a gold mining operation in Bougainville, Papua New Guinea, when, in fact, Sytner and his cohorts, including Megas, Miller, Wagamn and Wiseman, misappropriated the entirety of plaintiffs' wire transfer;

(b)     Falsely representing to plaintiff Katan that the defendants acquired $5million in capital with respect to the mining operation in which Plaintiffs investment, and that the value of the purported rights held by defendants in the mining operation was sufficient to fully secure plaintiffs' monetary investment;

(c)     Falsely representing to plaintiffs that defendant Sytner enjoyed diplomatic status and held influential positions of power in the U.S. and Papua New Guinea governments;

(d)     Falsely representing to plaintiffs that the mining operation plaintiffs invested in was operational and capable of producing gold for refining and sale;

(e)     Falsely representing that plaintiffs were issued shares in Cefeida, SA, when in fact no such certificates where ever issued;

(f)     Falsely representing to plaintiffs that the multiple bogus term sheets and agreements prepared by defendants, including, Synter, Wagman, and Megas, in connection with the Cefeida mining operation in Bougainville were true and accurate;

(g)     Falsely representing to plaintiffs that the $1.25 million wire transfers made by plaintiffs were for legitimate and true business purposes, when in fact, the money was misappropriated by Sytner and his cohorts, including Miller, Megas, Wagman and Wiseman.

(h)     Falsely representing that Cefeida SA was a valid and subsisting business entity.

(i)     Falsely representing that the additional $50,000.00 paid to defendants were to be used to buy gold to re-sell;

60.     The above acts were done in furtherance of defendants; unified fraudulent scheme, and were related to one another as part of the scheme including common participants, a common target, and a common purpose, and had the common result of harming plaintiffs and defrauding plaintiffs out of a large sum of money.

61. The multiple acts of racketeering amount to, and pose a threat of, continued criminal activity.

62. Defendants conducted and participated in the conduct of the affairs and the operation and management of the enterprise through the above mentioned pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

63. Defendants are separately and independently liable pursuant to 18 U.S.C. § 1962(a) because an object of the enterprise was and is that money fraudulently obtained from plaintiffs through defendants' racketeering activities was used and/or invested in the operation of the enterprise for numerous illegitimate purposes, including, but not limited to, the conduct of additional extortionate corporate campaigns, of salaries and fees to defendants for the purpose of engaging in further corporate campaigns and otherwise, and the ongoing operation of the enterprise.

64. Defendants are further separately and independently liable pursuant to 18 U.S.C. § 1962(b) by virtue of having maintained and interest and/or control of the enterprise's various sham corporate entities, including but not limited to Cefeida, SA, which have been maintained and controlled through a pattern of racketeering activity.

65. Plaintiffs have been injured in their business and property as a direct and proximate result of the violations of 18 U.S.C. § § 1962(a), 1962(b), and 1962(c).

66. Pursuant to 18 U.S.C. § § 1964(c), plaintiffs demand judgment against defendants jointly and severally for the damages suffered, in an amount to be proven at trial buut in no event less than $1,300,000.00, plus interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

67.     Plaintiffs also seek treble damages against defendants pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION

(Violation of 18 U.S.C. § 1962(d), *et seq.* as Against all Defendants)

68.     Plaintiffs repeat and re-allege each and every allegation set forth above.

69.     Defendants willfully combined, conspired and agreed to violate 18 U.S.C. §§ 1962(a), 1962(b) and 1962(c); that is, to conduct or participate directly or indirectly in the conduct of affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). This racketeering activity consisted of repeated violations of the federal mail fraud and wire fraud statutes.

70.     Defendants knew of, agreed to, and acted in furtherance of the overall objective of the conspiracy by, among other things, providing false documents and false information to plaintiffs to fraudulently obtain over $1,250,000.00.

71.     Plaintiffs have been injured in their business and property as a direct and proximate result of the conspiracy to commit the predicate acts of mail fraud and wire fraud in violation of 18 U.S.C. §1962(d).

72.     Pursuant to 18 U.S.C. § 1964(c), plaintiffs demand judgment against defendants jointly and severally for the damages suffered, in an amount to be proven at trial but in no event less than $1,300,000.00, plus interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

73.     Plaintiffs also seek treble damages against defendants pursuant to 18 U.S.C. 1964(c).

## THIRD CAUSE OF ACTION

**(Securities Fraud in Violation of § 12(a) (2) of the Securities act of 1933, § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 as Against All Defendants)**

74.     Plaintiffs repeat and re-allege each and every allegation set forth above.

75.     To the extent that it is determined that the fraudulent scheme involved the purchase or sale of securities, plaintiffs also plead a claim for securities fraud.

76.     Defendants, singularly and in concert, engaged in a palm, scheme, artifice and unlawful conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged ion acts, transactions, practices and courses of business that operated as a fraud upon plaintiffs.

77.     Defendants defrauded plaintiffs by use of the means or instrumentality of interstate commerce or the use of the mails, engaged in the use of manipulative and deceptive practices in connection with the sale of securities in violation of § 10(b) of the Securities Exchange Act of 1934, and Rule10b-5 promulgated thereunder.

78.     Defendants made various untrue statements of material facts and omitted material facts necessary in order to make the statements not misleading to plaintiffs.

79.     Such manipulative and deceptive practices included, *inter alia*, the use of untrue statements of material facts and omission of material facts, as alleged more particularly above, that a reasonable investor would have considered important in making an investment decision with respect to the subject securities.

80.     The purposes and effects of defendants' schemes were to use an investment vehicle operated by defendants to induce plaintiffs to invest money with defendants convert plaintiffs' investments.

81.     Defendants, pursuant to the plan, scheme, artifice, and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of false and misleading statements to plaintiffs, which were contained in various documents and communications specified herein, and further failed to disclose material facts to plaintiffs. These material representations and omissions include:

(a)     Falsely representing to plaintiff Khatan that the defendants acquired $5 million in capital and investments with respect to the Bougainville mining operation;

(b)     Falsely representing to plaintiff Khatan that the value of the purported exclusive rights acquired by defendants to exploit the Bougainville mine where of sufficient value as to fully secure plaintiffs' investment;

(c)      Falsely representing to plaintiff Khatan that $1.3 million dollar investment would be utilized to purchase equipment for and to otherwise fund the miming operation;

(d)     Falsely representing to plaintiff Khatan that defendant Synter enjoyed diplomatic status in Papua New Guinea and was influential in local politics;

(e)     Falsely representing to plaintiff Khatan that the Bougainville mine was operational and readily capable of producing gold;

(f)     Falsely representing to plaintiff that their investment would be utilized for legitimate business purposes;

(g)     Falsely representing to plaintiffs that the expected annual revenue of the mining operation would be $77,787,781.44 after the first year;

(h)     Falsely representing to plaintiffs that they would be granted a 35% equity stake in Cefeida, SA. In exchange for their investment and would be issued valid certificates evidencing same;

(i)     Falsely representing to plaintiffs that the multiple term sheets, proposals, documents and correspondence prepared by defendants in connection with the investment were true and accurate;

(j)     Falsely representing that Cefeida, SA was a valid and legitimate business entity;

(k)     Falsely representing to plaintiffs that defendants held exclusive mining and other valuable rights in the Bougainville mine.

82.     The misrepresentations and omissions made by the defendants were material in each instance with respect to each of the transactions to which they pertained.

83.     Defendants had actual knowledge of such false and misleading statements and omissions, or, in the alternative, recklessly disregarded the true facts concerning the business, assets, and operations when making verbal and/or written representations to plaintiffs.

84.     Defendants had a duty to promptly disseminate accurate and truthful information with respect to plaintiffs' investment.

85.     Defendants participated in the wrongdoing complained of in order to induce plaintiffs' participation in the various "investment" opportunities described above to continue the illusion of prospects for growth and increased profitability, and to conceal material facts.

86.     Plaintiffs were unaware of the falsity of the statements or omissions at the time plaintiffs placed funds with the defendants or the entities with which defendants told plaintiffs to place funds.

87.     Plaintiffs reasonably relied on defendants' representations and omissions in purchasing securities and investing with defendants and, but for those representations and omissions, plaintiffs would not have placed their funds with defendants.

88.     Defendants' conduct directly caused plaintiffs' losses.

89.     Defendants made each of the misrepresentation and omissions in connection with the purchase or sale of securities.

90.     By reason of the foregoing, in each instance, defendants violated § 10(b) of the Securities Exchange Act of 1934 ad Rule 10b-5 promulgated thereunder.

91.     Defendants are liable to plaintiffs for the full amount of all damages as shall be proved at trial, which include those sustained as a result of defendants' respective acts of securities fraud in violation of § 12(a)(2) of the securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

92.     Plaintiffs demand judgment against the defendants jointly and severally for damages exceeding $1.3 million, plus interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems Just and proper.

## FOURTH CAUSE OF ACTION

### (Fraud as Against All Defendants)

93.     Plaintiffs repeat and re-allege each and every allegation set forth above.

94.     The defendants each and in concert knowingly made false statements and misrepresentations to plaintiff as part of their pervasive scheme to defraud plaintiffs out of substantial sums of money.

95.     Defendants misrepresented or otherwise omitted material facts that were necessary in order to make the said statements not misleading. These material misrepresentations and omissions included all such misrepresentations and omissions set forth hereinabove.

96.     Plaintiffs relied on these false representations in making financial decisions, which caused them substantial monetary damage.

97.     The defendants knew that the statements they made to plaintiffs were materially false and misleading and were purposefully used as part of a scheme to steal plaintiffs' money.

98.     Plaintiffs demand judgment against all defendants, jointly and severally, for damages as proven at trial but in not event less than $1,300,000.00, plus interest, costs and reasonable attorneys' fees.

99.     In addition, given defendants particularly intentional and outrageous acts of fraud, and their pervasive conduct which was directed at others as well and not just plaintiffs, punitive damages should be assessed.

## SIXTH CAUSE OF ACTION

### (Conversion as Against all Defendants)

100.    Plaintiffs repeat and re-allege each and every allegation set forth above.

101.    Plaintiffs entrusted defendants with funds that were to be invested in accordance with defendants' representations.

102.    Defendants did not actually invest plaintiffs' money in an appropriate manner and instead converted all of plaintiff's funds.

103.    Defendants knew that the statements they made to plaintiffs were materially false and purposefully misleading and made for the purposes of furthering their scheme to convert and embezzle plaintiffs' $1.3 million "investment" in the Bougainville mine scheme.

104.    Defendants have each acted wantonly and retained these funds in violation of plaintiffs' rights.

105.    As a result of defendants' wrongful and intentional conversion of plaintiffs' investment funds, plaintiffs have been damaged.

106.    Plaintiffs demand judgment against defendants jointly and severally for damages exceeding $1.3 million dollars, plus interest, costs, and reasonable attorneys' fees.

107.    In addition, given defendants' particularly intentional and outrageous acts of conversion and theft, and their pervasive conduct which was directed at others as well, punitive damages should be assessed against defendants.

## SEVENTH CAUSE OF ACTION

### (Unjust Enrichment as Against All Defendants)

108.    Plaintiffs repeat and re-allege each and every allegation set forth above.

109.    Defendants fraudulently obtained investment funds from plaintiffs.

110.    Defendants received and used plaintiffs' funds for their own personal benefit.

111.    Because defendants fraudulently obtained plaintiffs' funds, it is not just, fair, equitable, or conscionable for defendants to benefit from their ill-gotten gains.

112.    As a consequence of the foregoing, defendants have been unjustly enriched in an amount to be determined at trial.

113.    Plaintiffs demand judgment against defendants jointly and severally for damages which exceed $1.3 million, plus interest, costs, reasonable attorneys' fees, and other such relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

### (Breach of Fiduciary Duty as Against Defendants Sytner, Wagman and Megas)

114.    Plaintiffs repeat and re-allege each and every allegation set forth above.

115.    At all times relevant to this complaint, defendants Sytner, Wagman and Megas were, by virtue of, inter alia,  their status as shareholders of Cefeida, SA, and by virtue of their conduct as particularized above, fiduciaries of the plaintiffs.

116.    As fiduciaries of Plaintiffs, Sytner and Megas owed and continue to owe plaintiffs a duty of full and candid disclosure and were and are prohibited from making misleading disclosures, oral and/or written, disseminating half truths and lies, or remaining silent as to any material matter affecting the Cefedia, Sa and the Bougainville mining operation, or their business and financial transactions.

117.    As fiduciaries, Sytner, Wagman and Megas owed and owe plaintiffs the duties of utmost good faith and undivided loyalty.

118.  Defendants Sytner, Wagman and Megas breached their fiduciary duties to plaintiffs by engaging in all of the deceitful, misleading and fraudulent conduct set forth specifically hereinabove.

119.    As a result of Synter, Wagman and Megas' breaches of their fiduciary duty to plaintiffs have incurred and continue to incur substantial damages.

120.    Plaintiffs demand judgment against defendants Sytner, Wagman and Megas in an amount to be proven at trial but in no event less than $1.3 million dollars.

121.    In addition, given their particularly intentional and outrageous acts,   and   their pervasive conduct which was directed at others as well, punitive damages should be assessed against Sytner, Wagman and Megas.

## NINTH CAUSE OF ACTION

### (Aiding and Abetting Sytner's, Wagman's and Megas' Breach of Fiduciary duty as Against all remaining Defendants)

122.     Plaintiffs repeat and re-allege each and every allegation set forth above.

123.     Defendants Miller, Wiseman and Berlin, each knowingly participated in, and aided and abetted, Sytner's, Wagman's and Megas' breaches of their fiduciary duties owed to plaintiffs by, *inter alia*, providing them with substantial assistance in connection with such breaches including, without limitation:

(a)     Working with them to solicit and obtain funds form plaintiffs under the false pretenses, and based upon the misrepresentations specifically alleged above;

(b)     Facilitating Sytner's, Wagman's and Megas' misrepresentations and schemes; and

(c)     Setting up and holding themselves out as principals, partners, officers, agents and/or other employees of the fictitious business entities Sytner, Wagman and Megas utilized to solicit and obtain funds from plaintiffs under false pretenses, and based upon the conduct and misrepresentations alleged above.

124.     Miller, Wiseman and Berlin each further knowingly participated in Sytner's, Wagman's and Megas' breaches of their fiduciary duties by providing substantial assistance to them in helping them conceal from plaintiffs such breached and the truth behind their scams and ruses.

125.     By virtue of their actions as particularized above, Miller, Wiseman and Berlin each knowingly induced, encouraged, participated in, and aided and abetted Sytner, Wagman and Megas in breaching their fiduciary duties owed to plaintiffs and directly benefited from, and will

continue to benefit from, such wrongful actions including, but not limited to, their receipt of plaintiffs' funds and the current and future profits derived from such funds.

126. By virtue of the knowing inducement, participation, encouragement, and aiding and abetting of Sytner, Wagman and Megas' breaches of their fiduciary duties committed by Miller, Wiseman and Berlin, plaintiffs have been substantially damaged in an amount to be determined at trail.

127. As a direct and proximate result of their knowing inducement, participation, encouragement, and aiding and abetting of Sytner's, Wagman's and Megas' breaches of their fiduciary duties owed to plaintiffs, Miller, Wiseman and Berlin are jointly and severally liable to plaintiffs: (i) for the full amount of the damage caused to plaintiffs thereby in an amount to be determined at trial believed to be in excess of $1.3 million; and/or (ii) to be required to account for and disgorge to plaintiffs all of the financial benefits, profits, and compensation they have earned or will earn by virtue of such acts in an amount to be proven at trial but in no event less than $1.3 million.

128. In addition, given their particularly intentional and outrageous acts of aiding and abetting the breaches of Sytner's, Wagman's and Megas' fiduciary duties, punitive damages should be assessed against Miller, Wiseman and Berlin.

## TENTH CAUSE OF ACTION

### (Negligence as Against All Defendants)

129. Plaintiffs repeat and re-allege each and every allegation set forth above.

130. Defendants owed plaintiffs, at a minimum, a duty of reasonable and ordinary care in their dealings with plaintiffs, including the care and competence of a reasonable investment advisor, business partner, and fiduciary.

131.    Defendants failed to satisfy the duties of care imposed upon them when they were entrusted with plaintiffs' funds, thereby resulting in damages to plaintiffs.

132.    Plaintiffs' funds and accounts were handled in a negligent manner incompatible with plaintiffs' investment objectives, and the purported professional skill, ability and business savvy of defendants, and defendants' purported professional and business competence.

133.    As a proximate result of defendants' negligence, plaintiffs have been damaged.

134.    Plaintiffs demand judgment against defendants jointly and severally for damages to be proven at trial but in no event less than $1.3 million, plus interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION

#### (Negligent Misrepresentation as Against All Defendants)

135.    Plaintiffs repeat and re-allege each and every allegation set forth above.

136.    Defendants were careless in imparting words upon which plaintiffs were expected to rely.

137.    Plaintiffs, unaware of the misstatements made by defendants, reasonably relied on the statements and representations of defendants.

138.    Defendants were aware of plaintiffs' reliance, and plaintiffs' reliance caused them to act or fail to act.

140.    Defendants induced plaintiffs to invest funds on the basis of false information that defendants purposefully supplied to plaintiffs.

141.    Defendants, individually and as agents of ne another and others, were authors of words expressed directly to plaintiffs, who were owed a duty of care by defendants, with knowledge that the words would induce reliance or be acted upon by plaintiffs.

142.    As a result of defendants' misrepresentations and omissions, plaintiffs have suffered economic harm.

143.    Plaintiffs demand judgment against defendants jointly and severally for damages as proven at trial but in no event less than $1.3 million, plus interest, costs, and reasonable attorneys' fess, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE, the Plaintiffs Amiron Development Corp., Herzel Meiri, and Itzhak Khatan, pray for the following relief:**

i.      Judgment as against all defendants on the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Tenth and Eleventh in an amount to be proven at trial but in no event less than $1.3 million, plus interest, costs, and reasonable attorneys' fees;

ii.     Judgment as against defendants Sytner, Wagman and Megas on the Eighth cause of action in an amount to be proven at trail but in no vent less than $1.3 million, plus interest, costs and reasonable attorneys' fees;

iii.    Judgment as against defendants Miller, Wiseman and Berlin, on the Ninth cause of action in an amount to be proven at trail but in no event less than $1.3 million, plus interest, costs, and reasonable attorneys' fees;

iv.     Judgment for Treble Damages as against all defendants as permitted by law;

v.      Judgments as against all defendants for punitive damages as permitted by law; and

vi.     Awarding plaintiffs such further and other relief as this Court deems just

and proper.

Dated:  Great Neck, NY
        May 04, 2012


                                    **GALLO & ASSOCIATES, PLLC**



                                    By:     Anthony J. Gallo, Esq. (AJG7746)
                                            Attorneys for Plaintiffs
                                            445 Northern Blvd., Suite 11
                                            Great Neck, New York 11021
                                            Tel. (516) 342-5880
                                            Fax (516) 342-5729

STATE OF NEW YORK     )
COUNTY OF NASSAU      ) Ss:

I, Itzhak Khatan, being duly sworn, depose and say:

I am one of the individual Plaintiffs herein; I have read the foregoing **VERIFIED**

**COMPLAINT** and know the contents thereof; the same are true to my own knowledge,

except as to the matters therein stated to be alleged on information and belief, and as

to those matters, I believe them to be true.

Itzhak Khatan

**Sworn to before me this**

**04**th **day of May, 2012**

**NOTARY PUBLIC**

ANTHONY J. GALLO
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02GA5073464
QUALIFIED IN SUFFOLK COUNTY
COMMISSION EXPIRES APRIL 24, 20 _17_

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                    Case No.

**AMIRON DEVELOPMENT CORP., HERZEL MEIRI
and ITZHAK KHATAN ,**

**Plaintiffs,**

**-against-**

**STEWART SYTNER, HILARY SYTNER a/k/a
HILARY BERLIN, THOMAS P. MEGAS,
CEFEIDA, SA, SCOTT WAGMAN, MILTON
MILLER, and DAVID WISEMAN,**

**Defendants.**

---

**VERIFIED COMPLAINT WITH JURY DEMAND**

---

GALLO & ASSOCIATES, PLLC
Attorneys for Plaintiffs
445 Northern Blvd., Suite 11
Great Neck, New York 11021
(516) 342-5729

---

TO:

Service is hereby admitted
Dated:              , 2012

_____
Attorney(s) for Defendants